**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

---

Chester C. Graham,

      Plaintiff,

v.

Intelemedia Communications, Inc.
and Intelemedia Premier Leads, LLC,

      Defendants.

Case No. 20-cv-1525 (DTS)

**ORDER**

---

Plaintiff Chester Graham alleges Defendants Intelemedia Communications, Inc. (Intelemedia) and Intelemedia Premier Leads, LLC (IPL) violated the Telecommunications Consumer Protection Act (TCPA) by making three autodialed calls with recorded messages (robocalls) to his cell phone without his prior express written consent. *See* 47 U.S.C. § 227(b)(1)(A). He also alleges they failed to provide him with a copy of their do-not-call policies in violation of FCC Rule 64.1200(d)(1). He seeks treble statutory damages under the TCPA. Defendants move for summary judgment on various grounds, the primary one being that there was no violation of the TCPA because Graham gave prior express written consent by telephone keypress to receive the calls. Dkt. No. 66. They also move for sanctions against Graham for bringing this lawsuit in bad faith and for his conduct during the litigation. Dkt. No. 85.

The Court concludes there is no genuine dispute that Graham gave prior consent to receive the robocalls and therefore the calls did not violate the TCPA. Graham's claim based on the do-not-call policy and regulation also fails. Therefore, the Court grants

Defendants' summary judgment motion. The Court grants in part and denies in part Defendants' motion for sanctions.

## I.      Summary Judgment Motion

### A.      Findings of Fact

IPL created and operated a sweepstakes game called MoneyCall (also known as Dreamsweepstakes). Moffet Decl. ¶ 5, Dkt. No. 70. Intelemedia is the parent company of IPL. *Id.* ¶ 7. Intelemedia did not create or participate in the operation of MoneyCall, and does not make telemarketing calls or otherwise engage in telemarketing. *Id.* ¶ 8. Intelemedia does not manage or control IPL's operation of its promotion games, including the MoneyCall game. *Id.*

In the MoneyCall game, people who called a certain phone number could "opt in by keypress" to participate in a sweepstakes to win money and other prizes, while also giving "written consent by keypress" to receive telemarketing calls from IPL. *Id.* ¶ 5. Callers opted in by pressing "1" as explained during the recorded message.

Graham's phone records show that on August 1, 2019 at 8:53:12 a.m. Central Time he used his cell phone number ending in -9014 to call a phone number (786-808-4701) belonging to Call Delivery System (CDS). Bradley Decl. Ex. A (Sprint records) at 1, Dkt. No. 69 at 10; Moffet Decl. ¶ 9, Dkt. No. 70. CDS is a service used by IPL to receive calls to IPL and transfer them to the appropriate IPL phone number. Moffet Decl. ¶ 9. Graham's outbound call lasted 282 seconds. Bradley Decl. Ex. A at 1.

IPL's records show the same call (except the time reflects the Eastern Time Zone): an inbound call from Graham's -9014 number to the CDS number on August 1, 2019 at

2

9:53:31 a.m. Eastern Time.[1] Moffet Decl. ¶ 9 & Ex. A (IPL records for -9014), Dkt. No. 70 at 8. IPL's telephone system automatically records detailed information for every call it receives and for every outgoing call that is made using the system. *Id.* ¶¶ 11-12 & Ex. A.[2]

During the August 1, 2019 call Graham heard a message to press "1" for English or "2" for Spanish." *Id.* ¶¶ 9-10. He pressed "1" and the call was transferred from CDS to IPL (385-404-3045) to play the "CDS MoneyCall Fixed Price" game. *Id.* ¶¶ 10, 13 & Ex. A. Once connected to IPL, the call lasted 268 seconds. *Id.* ¶ 13 & Ex. A.

After the call was transferred from CDS to IPL, Graham heard the following message:

> Congratulations! You have been chosen to play MoneyCall with a chance to win $1,000! Hang on the line to find out how! OK. Here's the deal — if you win our biggest jackpot ever — $1,000 dollars — we'll call you back at this number! Then each week you'll receive calls to play for more chances to win $1,000! No purchase necessary. **By pressing 1, you consent to receive autodialed and pre-recorded calls which may include telemarketing messages from or on behalf of Intelemedia Premier Leads to the number you are calling from.** You'll receive calls to play. You have multiple chances to win and consent is not a condition of purchase. Simply press 1 now for your chance to win $1,000 dollars cash! Or press 2 to hear other great offers. To stop receiving calls from MoneyCall, dial 855-358-0900. Press one now to win $1,000.

*Id.* ¶ 15 (emphasis supplied).

Graham pressed key number "1" and heard a second message:

> Thanks! You've been registered to win MoneyCall's new $1,000 dollar weekly giveaway. **You previously consented to receive autodialed and**

---

[1] Apart from the Eastern versus Central time zone, the slight difference between the "8:53:12" outbound call in Graham's Sprint records and the "9:53:31" inbound call shown in the IPL records is due to the transfer process involving CDS before the call was connected to IPL. *See* Defs. Reply Mem. 6, Dkt. No. 80.
[2] Moffet's Declaration describes the information in the Exhibit A IPL records by referring to columns labeled A, B, C, and so forth. No such labels appear on Exhibit A; however, the detailed description of each column makes it possible to understand the information even without the labels. *See* Moffet Decl. ¶ 12 & Ex. A, Dkt. No. 70.

> **pre-recorded calls which may include telemarketing messages from or on behalf of Intelemedia Premier Leads to the number you are calling from.** You have multiple chances to win and consent is not a condition of purchase. You'll find official rules at www.moneycall.tv. To opt out, dial 855-358-0900. Good luck! Now here are your special offers.

*Id.* (emphasis supplied). He then heard three advertisements and terminated the call. *Id.* ¶¶ 13, 16 & Ex. A.

Thereafter, IPL made robocalls to Graham's -9014 number on August 6, 7, 8, 9, 13, and 14. Two calls were terminated at the phone menu, and four calls transferred to an advertisement. *Id.* ¶ 16 & Ex. A. During those four calls (August 8, 9, 13, and 14) Graham heard the following message:

> Feeling Lucky? Let's play MoneyCall! But first let's get the legal stuff out of the way! **You previously consented to receive autodialed and pre-recorded calls which may include telemarketing messages from or on behalf of Intelemedia Premier Leads to the number you are calling from.** Glad that's over! Now Press 1 for a chance to win 1,000 dollars.

*Id.* ¶ 17 (emphasis supplied) & Ex. A. As programmed, the call terminates if no keypress selection is made. *Id.* ¶ 17.

IPL's records show Graham pressed "1" during the August 8, 9, 13, and 14 calls and then heard this message:

> Great! Now you could double your luck right now! Double your chances of winning by listening to one of our EXCLUSIVE offers. Press one when you hear an offer you like and you will get a BONUS entry into this week's sweepstakes drawing for 1,000 dollars. You have multiple chances to win and consent is not a condition of purchase. To stop receiving calls from "MoneyCall", dial 855-358-0900. Here is your first EXCLUSIVE offer.

*Id.* ¶ 17 & Ex. A. Graham then heard an ad for ListenClear hearing aids. *Id.*

Graham concedes he pressed "1" during the August 1, 2019 call. Bradley Decl. ¶ 8 (Ans. to Int. No. 4),[3] Dkt. No. 69. He also states he did not call 855-358-0900 to stop receiving calls from MoneyCall. *Id.* ¶ 9 (Ans. to Int. No. 5). IPL put him on its permanent do-not-call list after it received correspondence from him. Dkt. No. 77-1 at 10-11 (June 30, 2020 IPL letter).[4]

Graham received IPL's do-not-call policy, but states he had to request it four times. On three dates, Graham sent two separate but identical letters to the identical address, but with different addressees: one letter addressed to IPL and the other to Intelemedia. Dkt. No. 77-1 at 1-4, 8-9. On a fourth date, Graham sent a single letter listing both IPL and Intelemedia as addressees. *Id.* at 6. IPL told Graham in a June 30, 2020 letter that it had no record of receiving correspondence from him on the first two dates. *Id.* at 10. It is not clear whether Graham received a copy of the policy multiple times: his memorandum states he received a copy on June 30, 2020, Pl. Mem. ¶ 16, Dkt. No. 75; Graham Decl. ¶¶ 2.A - D, F to H, Dkt. Nos. 77, 77-1; his discovery responses state he received a copy in October 2020, Bradley Decl. ¶ 14 (Ans. to Int. No. 12) & Ex. C (Oct. 15, 2020 letter & attached policy), Dkt. No. 69 at 21-23. Intelemedia does not have a do-not-call policy

---

[3] Interrogatory No. 4: On August 1, 2019, when your call was connected to MoneyCall, did you keypress "1" to enter a chance to win $1,000?
Answer: Yes.

[4] IPL's June 30, 2020 letter does not say when it added his number -9014 to its permanent do-not-call list, but presumably it was sometime after receiving his February 28, 2020 letter enclosing a copy of his complaint, which IPL says is the first communication it received from him. The June 30 letter also acknowledges receipt of his May 11, 2020 letter. IPL also states that, after the August 14, 2019 call, it had discontinued further calls to number -9014 pursuant to its own internal policies and procedures. None of Graham's letters to IPL/Intelemedia included a specific request not to call him or to be placed on a do-not-call list, or a statement that he was on any do-not-call list. *See* Dkt. No. 77-1 at 1-9.

because it does not make telemarketing calls or otherwise engage in telemarketing.

Moffet Decl. ¶ 8, Dkt. No. 70.

Graham filed this lawsuit on July 6, 2020, alleging Defendants are liable for treble

statutory damages under the TCPA for the three robocalls on August 9, 13, and 14, 2019

(Count One) and for failing to send him a copy of their do-not-call policies (Count Two).

Dkt. No. 1. The three calls are as follows:[5]

**IPL call records for Graham number -9014:**
(Moffet Decl. Ex. A, Dkt. No. 70 at 8)

| | | | |
|---|---|---|---|
| 8/9/2019 | 11:36:57 EST | 212 seconds[6] | outbound |
| 8/13/2019 | 11:01:00 EST | 154 seconds | outbound |
| 8/14/2019 | 11:07:09 EST | 160 seconds | outbound |

**Graham's -9014 phone records from Sprint**:
(Bradley Decl. Ex. A, Dkt. No. 69 at 10, 12-14)

| | | | |
|---|---|---|---|
| 8/9/2019 | 10:37:04 CST | 201 seconds | inbound |
| 8/13/2019 | 10:01:03 CST | 148 seconds | inbound |
| 8/14/2019 | 10:07:17 CST | 149 seconds | inbound |

### B.    Conclusions of Law

Defendants move for summary judgment on several grounds. First, they state that

Intelemedia played no role in the MoneyCall sweepstakes game or the robocalls; does

not engage in telemarketing and is not required to have a do-not-call policy; and thus all

---

[5] There is no dispute these are the three calls Graham identifies in his Complaint ¶ 26, though that paragraph contains typographical errors regarding Central versus Eastern Time and incorrectly lists "August 13" twice rather than August 13 and 14. The Court also notes that, though Graham's discovery responses claimed he was seeking statutory damages for four calls — the ones on August 9, 13, and 14, plus a call on August 1 — that assertion is not consistent with his Complaint and, more importantly, the records show the August 1 call was an outbound call made by Graham, not an inbound call from IPL.
[6] The call transfer process accounts for the slight differences in the call durations logged on Graham's phone records and the durations shown in the IPL records. *See* Defs. Reply Mem. 6, Dkt. No. 80.

claims against Intelemedia must be dismissed. Next, they claim they are entitled to summary judgment on Count One because the statutory provision at issue was unconstitutional and unenforceable at the time of the robocalls, and, on the merits, the calls did not violate the TCPA because Graham gave prior express written consent by telephone keypress. As to Count Two, they contend his claim for failure to provide the do-not-call policy fails as a matter of law and also under the facts here, because he admits he received a copy of the policy. Motion & Mem., Dkt. Nos. 66, 68. In their reply memorandum Defendants raise the additional argument that they are entitled to summary judgment based on collateral estoppel. Pl. Reply Mem. 3-4, Dkt. No. 80.[7]

### 1.    Legal Standard

Summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the lawsuit under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* In assessing whether a genuine dispute exists, the Court views the evidence in the light most favorable to the nonmoving party and affords him all reasonable inferences. *Rooney v. Rock-Tenn Converting Co.*, 878 F.3d 1111, 1115 (8th Cir. 2018).

---

[7] This additional argument is based on Graham's reference in his opposition memorandum to a previous lawsuit he filed against different defendants regarding the ListenClear hearing aid advertisements he heard during the three robocalls. *See* Pl. Mem. ¶ 32 & n.9, Dkt. No. 75. That lawsuit, *Chester C. Graham v. Clearity LLC d/b/a ListenClear, et al.*, District of Minnesota Case No. 19-cv-2779, was filed in state court and removed to federal court in October 2019. The parties settled, and the case was closed in February 2020. *See* No. 19-cv-2779 case docket.

7

The moving party bears the initial responsibility of identifying the basis for its motion and the portions of the record that it believes demonstrate the absence of a genuine dispute of material fact. *Bedford v. Doe,* 880 F.3d 993, 996 (8th Cir. 2018). Once the moving party satisfies the initial burden, the nonmoving party must respond by submitting evidentiary materials of specific facts showing the presence of a genuine issue for trial. *Id.* at 997. The nonmoving party must do more than raise some metaphysical doubt about the material facts and cannot rest on mere denials or allegations. *Id.* Rather, the nonmovant must present enough evidence so that a jury could reasonably find in his favor. *Id.*

### 2. Analysis

### (a) Parent Company Intelemedia

Graham sued both IPL and its parent company Intelemedia because he did not know which entity played which role (if any) in the three robocalls on August 9, 13, and 14, 2019. Pl. Mem. ¶ 43, Dkt. No. 75; Bradley Decl. ¶ 10 (Ans. to Int. No. 6), Dkt. No. 69. Defendants submitted the Declaration of Donald Moffett, the General Manager and Chief Operating Officer of IPL, who stated that IPL created and operated the MoneyCall sweepstakes game. Moffet Decl. ¶ 5, Dkt. No. 70. He also stated that Intelemedia did not create or participate in the operation of MoneyCall, does not make telemarketing calls or otherwise engage in telemarketing, and does not manage or control IPL's operation of its promotion games, including the MoneyCall game. *Id.* ¶ 8. Further, because it is not a telemarketer it is not required to have a do-not-call policy under the TCPA. Graham has not put forth any specific facts or evidence to challenge these statements or create a

8

genuine issue for trial. *See* Pl. Mem. ¶ 43, Dkt. No. 75. Accordingly, the Court grants summary judgment to Intelemedia on all claims in Counts One and Two.

### (b)   Constitutional Issue

Defendants argue they are entitled to summary judgment on Count One because 47 U.S.C. § 227(b)(1)(A)(iii) was unconstitutional and unenforceable at the time of the August 2019 robocalls. Section 227(b)(1)(A)(iii) requires a party making robocalls to cell phones to obtain prior express consent from the called party. In *Barr v. American Ass'n of Political Consultants, Inc. (AAPC),* 140 S.Ct. 2335 (2020), the Supreme Court held that subsection (iii) was unconstitutional because a clause added by a 2015 amendment created an exception for robocalls made solely to collect a debt owed to or guaranteed by the United States. *Id.* at 2343, 2347-48. This government-debt exception resulted in an unconstitutional content-based restriction on speech under the First Amendment. *Id.* The Supreme Court did not invalidate the robocall restrictions in their entirety but instead cured the constitutional violation by severing the 2015 government-debt exception from the remainder of the statute. *Id.* at 2348-49, 2356. In doing so, it determined that the remaining statute was capable of functioning independently and thus would be fully operative as a law. *Id.* at 2353. In fact, as the Supreme Court pointed out, "the remainder of the robocall restriction did function independently and fully operate as a law for 20-plus years before the government-debt exception was added in 2015." *Id.*

Defendants argue there were no valid robocall restrictions under § 227(b)(1)(A)(iii) during the period from the unconstitutional 2015 amendment until the 2020 *AAPC* decision. They contend that, because the statute had no legal effect during that time, it is unenforceable as to the alleged violations in August 2019. Defs. Mem. 7-9, Dkt. No. 68.

They acknowledge this is the minority view of courts that have considered the issue post-*AAPC*. *Id.* at 8 n.3. The Eighth Circuit has not yet addressed this question. The *AAPC* decision itself offers only a comment in a footnote by the three-justice plurality that the decision "does not negate the liability of parties who made robocalls covered by the robocall restriction" between the 2015 amendment and the 2020 *AAPC* decision. *AAPC,* 140 S.Ct. at 2355 n.12.

The Court agrees with the majority of post-*AAPC* cases that the proper approach is to disregard the unconstitutional government-debt provision that was severed and apply § 227(b)(1)(A)(iii) to the facts here. *See, e.g., Lindenbaum v. Realgy, LLC,* 13 F.4th 524 (6th Cir. 2021), *pet. for cert. filed,* No. 21-866 (U.S. Dec. 10, 2021); *Gunn v. Prospects DM, LLC,* No. 4:19cv3129, 2021 WL 1534234, at *3 (E.D.Mo. Apr. 19, 2021) (collecting cases). The Court thus "interpret[s] what the statute has always meant in [the] absence" of the constitutionally offending 2015 amendment. *Lindenbaum*, 13 F.4th at 530. Thus, the Court denies Defendants' motion for summary judgment to the extent it is based on the argument that § 227(b)(1)(A)(iii) was a nullity and unenforceable with respect to the August 2019 robocalls.

### (c)     Prior Express Written Consent by Keypress

In Count One of his Complaint, Graham seeks treble statutory damages ($1,500 per call) for the three robocalls on August 9, 13, and 14, 2019. Compl. ¶ 52, Dkt. No. 1. Defendants argue they are entitled to summary judgment on Count One because the evidence establishes that Graham gave prior express written consent by telephone keypress to receive the calls from IPL and there is no genuine issue for trial. The Court agrees.

10

Section 227(b)(1)(A) authorizes telemarketing robocalls so long as the calling party has "prior express consent" from the called party. The FCC has determined that this means "prior express written consent." *In re Rules & Regulations Implementing the TCPA of 1991,* 27 FCC Rcd. 1830, 1838-1839, ¶¶ 20-22, 2012 WL 507959, at *6 (F.C.C. Feb. 15, 2012). Such prior express written consent includes electronic consent under the E-Sign Act, "including permission obtained via an email, website form, text message, **telephone keypress**, or voice recording." *Id.* at 1843-44, ¶¶ 32-34 (emphasis supplied), 2012 WL 507959, at *10.

As set forth in detail above in the facts section, Defendants presented IPL records for Graham's cell phone number -9014, which are consistent with Graham's own Sprint phone records, along with the Moffett Declaration. Together this evidence explains in detail how the IPL records were generated, what they show, and how Graham gave consent by telephone keypress in his August 1, 2019 call to receive telemarketing robocalls. This evidence demonstrates that IPL complied with the TCPA because the calls on August 9, 13, and 14, 2019 were made with Graham's prior express written consent.

Graham has not presented specific facts to counter Defendants' evidence. First, he mischaracterizes their argument by stating that keypress consent cannot be given during the robocall itself. Pl. Mem. ¶¶ 50-52, Dkt. No. 75. That is not their argument or their evidence. *See* Defs. Reply Mem. 10-12, Dkt. No. 80. Rather, the evidence shows Graham gave keypress consent during the August 1, 2019 call that he himself made, not during a call from IPL. He was the caller, not the called party, on August 1. The August 9, 13, and 14 robocalls were made based on that prior consent. Thus, the cases Graham cites are inapposite because they simply say that a request to press "1" as part of the

11

telemarketing call itself is not "prior" consent. *See Booth v. Appstack, Inc.*, No. C13-1533, 2015 WL 1466247, at *11 (W.D. Wash. Mar. 30, 2015); *Charvat v. Allstate Corp.*, 29 F.Supp.3d 1147, 1150 (N.D. Ill. 2014).

He also mischaracterizes Defendants' argument by asserting that his failure to opt out of receiving future calls by dialing 855-358-0900 did not entitle IPL to continue making robocalls to him in violation of the TCPA.  Pl. Mem. ¶¶ 10-11, Dkt. No. 75. Again, that is not their argument. As stated above, their argument and evidence is that authorization for the August 9, 13, and 14 robocalls was provided by his keypress consent on August 1, not by his failure to call 855-358-0900 to opt out.

Graham also states that "Defendants do not offer any details as to what this record [the IPL record of the August 1, 2019 call at 9:53 a.m. Eastern Time] purports to represent." *Id.* ¶ 26. That is untrue. As discussed above, Defendants presented detailed evidence and explanation in Moffet's Declaration, along with arguments in their memorandum, that describe what the IPL records show, specifically including the August 1, 2019 call.

In addition to misrepresenting Defendants' arguments and evidence, Graham also makes statements about the record that are either plainly false or, at most, half-truths. For example, he asserts that the IPL records show that Defendants made the August 1, 2019 call to him at 8:53 a.m. Central Time. *Id.* ¶¶ 23, 47. This is false. IPL's record, the Moffet Declaration, and Graham's own Sprint phone records show that he was the caller. Elsewhere in his memorandum he says the opposite: he admits he was the caller on August 1, 2019 at 8:53 a.m., but claims he called the U.S. District Court for the District of

Minnesota[8] at 786-808-4701. *Id.* ¶ 27. This too is false, as the Court pointed out to him at oral argument. That number, shown on his Sprint phone records, is not and never has been the number of the federal court. As Graham knows, Moffet's Declaration identifies 786-808-4701 as a number belonging to CDS, the service used by IPL to receive calls to IPL and transfer them to the appropriate IPL number. *Id.* ¶ 29

Apart from his plainly false statements, Graham relies on conclusory and disingenuous statements. For example, he says IPL sent him a letter on June 30, 2020 claiming he made the August 1, 2019 call at "9:53 a.m." but that his own Sprint phone records show "no such call." *Id.* ¶¶ 24-25. But Graham knows that the IPL records are shown in Eastern Time whereas his Sprint records show Central Time, and that the same call is shown on both the IPL and Sprint records. *See* Moffet Decl. ¶ 14, Dkt. No. 70. For Graham to suggest that his phone records do not show the call at issue is misleading and untrue.

Similarly, he claims his Sprint phone records show he "did not make any calls to the Defendants." Pl. Mem. ¶ 45, Dkt. No. 75. But he cannot dispute that those records show he was the caller (not the called party) on the August 1, 2019 call at 8:53 a.m. Central Time. For Graham's statement to have even a grain of truth, one has to interpret it narrowly to mean he called *someone* on August 1 but it was not the *Defendants*, it was the service intermediary CDS, which then transferred his call to IPL. This is, at best, disingenuous and ignores the larger truth that Defendants' credible and unrefuted

---

[8] Although his summary judgment opposition memorandum does not identify which federal district court it was, he stated at the motion hearing and in his later memorandum opposing sanctions that the number was for the District of Minnesota and that he had no dealings with any other federal district court. *See* Pl. Mem. (Sanctions) ¶ 62, Dkt. No. 82.

evidence shows he made the outbound call on August 1, 2019 and during it he gave express written consent by telephone keypress to receive future telemarketing robocalls. As he has not offered any facts to raise a genuine dispute of material fact, Defendants are entitled to summary judgment on Count One.

### (d)     Do-Not-Call Policy ─ 47 C.F.R. § 64.1200(d)(1)

Telemarketers are required to have a written policy, available upon demand, for maintaining a do-not-call list. 47 C.F.R. § 64.1200(d)(1). This rule states, in relevant part:

> (d) No person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted **procedures for maintaining a list of persons who request not to receive telemarketing calls** made by or on behalf of that person or entity. The procedures instituted **must meet the following minimum standards**:
>
> > (1) Written policy. Persons or entities making calls for telemarketing purposes **must have a written policy, available upon demand, for maintaining a do-not-call list.**

(Emphasis supplied.) Among the other minimum standards set out in this rule are requirements for training personnel in how to use the do-not-call list; recording requests by individuals to be placed on the do-not-call list; identifying on whose behalf the telemarketing call is being made; maintaining do-not-call lists and honoring such requests for at least five years; and so forth. *Id.* § 64.1200(d).

In Count Two of his Complaint, Graham alleges IPL and Intelemedia each violated § 64.1200(d)(1) four times by failing to send him a copy of their do-not-call policies in response to his requests. He seeks treble statutory damages ($1,500 per violation) under § 227(b)(3) of the TCPA for the eight alleged violations of § 64.1200(d)(1). Compl. ¶¶ 53-55, Dkt. No. 1.

First, as discussed above, Graham does not challenge the evidence that Intelemedia is not a telemarketer and is not required to have a do-not-call policy. Thus, his Count Two claim only pertains to IPL.

Second, though neither side raises this issue, the Court notes that Graham's requests for a copy of IPL's policy are specifically directed to the national do-not-call registry, which is addressed in a different section of the statute than the one Graham pleaded in Count Two. His letters request "a copy of your policy regarding the do-not-call list maintained by the Federal Trade Commission." *See* Dkt. No. 77-1 at 1-4, 6-9; Compl. ¶¶ 33, 38, 40, Dkt. No. 1. A telemarketer's obligations regarding the national do-not-call registry are found in § 64.1200(c), not § 64.1200(d). Subsection (c) requires that a telemarketer have "written procedures to comply with the national do-not-call rules." In contrast, subsection (d) pertains to a telemarketer's internal do-not-call lists, *i.e.,* individuals "who request not to receive telemarketing calls made by or on behalf of that person or entity." 47 C.F.R. § 64.1200(d).

Notably, subsection (d)(1)'s language requiring a written policy "available upon demand" is absent from subsection (c). Based simply on the language of the two subsections, it is not obvious that subsection (d)(1)'s requirement that a telemarketer have a "written policy, available upon demand, for maintaining a do-not-call list" is broad enough to encompass the national registry, which is addressed in subsection (c). Neither party cited any authority on this question (nor addressed subsection (c) at all) because Graham explicitly pleaded and argued Count Two as a violation of subsection (d)(1). But given that all of Graham's requests were for the "policy regarding the do-not-call list maintained by the Federal Trade Commission" and his claim is that IPL is liable for failure

to provide it "upon demand," Graham's claim fails under the plain language of subsection (c) which has no requirement that a telemarketer provide any such policy upon demand.

Turning to the arguments relating to § 64.1200(d)(1), IPL contends it is entitled to summary judgment for several reasons. First, they assert that any claim he may have under § 64.1200(d)(1) fails because he admits he received a copy of IPL's do-not-call policy. Second, they contend no private right of action exists pursuant to § 227(b)(3) for a violation of Rule 64.1200(d)(1), because the FCC promulgated Rule 64.1200(d) pursuant to § 227(c)(5), not § 227(b)(3) as Graham contends. Third, they assert that, in any event, relief under § 64.1200(d)(1) is not available to Graham because his activities as a serial TCPA plaintiff make him a commercial rather than residential subscriber, and because statutory damages are not available for failing to provide a do-not-call policy. *See* Defs. Mem. 18-22, Dkt. No. 68; Defs. Reply Mem. 14-18, Dkt. No. 80.

The Court disagrees with Defendants' assertion that the "facts show that Plaintiff was a commercial (not residential) telephone subscriber" based on the fact that he is a serial TCPA plaintiff. Defs. Reply Mem. 18, Dkt. No. 80.[9] They have cited no authority for the proposition that bringing multiple TCPA lawsuits by itself amounts to a "business" or equates to "commercial" use of a phone for purposes of the TCPA. In addition, Graham stated he is a "consumer" and his -9014 cell number is for a Lifeline phone account and is his only number; the Court also notes he was granted IFP status as an individual in this lawsuit. *See* Pl. Mem. ¶¶ 1, 22, Dkt. No. 75. The Court does not find summary judgment is warranted on the basis that Graham is a commercial telephone subscriber.

---

[9] Graham's 16 TCPA lawsuits in this District are identified and discussed in Part II of this Order.

Next, the Court addresses Defendants' argument that there is no private right of action "available" to Graham for the purported violation of § 64.1200(d). Defs. Mem. 20, Dkt. No. 68. Defendants argue that Graham invoked the wrong provision as authority for his claim in Count Two. Graham seeks statutory damages under § 227(b)(3)(A) for his claim that Defendants violated § 64.1200(d)(1) by failing to send him the do-not-call policy. Compl. ¶¶ 2-3, 53-55, Dkt. No. 1; Pl. Mem. ¶ 17, Dkt. No. 75.

Section 227(b)(3) authorizes a private right of action for a "violation of this subsection or the regulations prescribed under this subsection" for which a person may recover for actual monetary loss or receive $500 in statutory damages for each violation, whichever is greater. 47 U.S.C. § 227(b)(3)(A)-(B). Treble damages are available for willing or knowing violations. *Id.* § 227(b)(3)(C). Defendants argue that § 64.1200(d) was enacted pursuant to § 227(c), not § 227(b), and point out that Graham agrees with them on this point. *See* Defs. Reply Mem. 16, Dkt. No. 80.[10] They contend Graham's "fatal error" was that he alleged a violation of § 64.1200(d)(1) but sought damages under § 227(b)(3) rather than § 227(c). *Id.* They assert summary judgment must be granted because "damages under 227(b) are unavailable for claims made pursuant to 227(c) via 64.1200(d)(1)." *Id.*

Setting aside the specific legal arguments, the Court finds that Graham's claim (to the extent he has one) fails at the outset based on the particular facts here. He admits he received a copy of IPL's do-not-call policy on June 30 and/or in October 2020. Thus, IPL

---

[10] Defendants cite ¶ 79 of Graham's memorandum at Dkt. No. 75, in which he states that § 64.1200(d) was "enacted under 47 U.S.C. § 227(c), and not 47 U.S.C. § 227(d)." The Court notes that Defendants do not argue the regulation was enacted under § 227(d).

had the required "written policy" and provided it to Graham after he "demanded" it, thus satisfying § 64.1200(d)(1).

Graham's only complaint is that he requested the policy four times between November 2019 and June 2020 before he received it.[11] But he cites no authority that establishes any time frame for a telemarketer to provide a copy of a policy "upon demand," nor any authority for his contention that each request that was not met with an immediate response is a separate violation of § 64.1200(d). For that matter, he has failed to offer any authority that a *complete* failure to provide a copy of the do-not-call policy (which is not what happened here) is a stand-alone violation of § 64.1200(d)(1) for which an award of statutory damages is available separate and apart from the damages awarded for an unlawful call itself. And the robocalls on August 9, 13, and 14, 2019 were not unlawful calls. Given these facts, the Court considers it unnecessary to analyze whether damages are available "per call" or "per violation" under any applicable provision of the TCPA.

Moreover, the underlying facts of this lawsuit have nothing to do with being on a do-not-call list, or with the adequacy of IPL's do-not-call policy — which is the subject matter of § 64.1200(d). Although Graham's Complaint includes one factual allegation that he was on the national do-not-call list, (1) he was not in fact on the list at the time of the August 2019 robocalls, and (2) his opposition to summary judgment is based on his purported lack of prior consent to the robocalls, not that he was on a do-not-call list.

As to the first point, the Complaint in this lawsuit states:

The Defendants' failure to send Plaintiff a copy of their policy relating to the do-not-call list was willful and knowing, as is evidence[d] by their repeated

---

[11] Though it does not ultimately matter to the Court's analysis, it would appear Graham alleges at most only three, not four, violations for IPL's failures to send him the policy, given that he received it after his fourth request.

ignoring of the three requests Plaintiff made and by the **Plaintiff being on the do-not-call list maintained by the FTC**.

Compl. ¶ 43 (emphasis supplied), Dkt. No. 1. The calls in this lawsuit occurred in August 2019. Graham requested the do-not-call policy on November 27 and December 2, 2019, and May 11 and June 26, 2020. Dkt. No. 77-1 at 1-4, 6-9. Graham filed his Complaint on July 6, 2020. According to one other TCPA lawsuit he filed, he added his number to the national do-not-call registry on March 11, 2020 (see below), *i.e.,* after the robocalls and after two of his four requests for the policy. But according to yet another TCPA lawsuit Graham commenced that was removed to federal court, he did not add his number to the national registry until over a year after that, on May 5, 2021 (see below), *i.e.,* after all of the events in this lawsuit took place, and 10 months after he filed the lawsuit.[12]

Just eight days after filing this lawsuit, Graham filed another one in this District (No. 20-cv-1575) in which he stated that he registered number -9014 on the national do-not-call list on March 11, 2020:

> ¶ 15.  Chester C. Graham is a senior citizen who . . . had a cell telephone with a number ending in 9014 which has been on the National Do Not Call Registry of the Federal Trade Commission (FTC) **since March 11, 2020**.

> ¶ 20.  Despite Plaintiff's being on the FTC National Do Not Call Registry, **beginning in March of 2020**, Defendant repeatedly called Plaintiff's cellphone.

---

[12] Even on its face, ¶ 43 of his Complaint does not make sense. It contends that because Defendants knew he was on the national do-not-call list, they willfully decided not to send him a copy of their policy. But ¶ 43 has no nexus to the robocalls, which were made long before he added his name to the national registry. Moreover, Graham's own signed pleadings in other lawsuits, most specifically his complaint and exhibit in No. 21-cv-2367, show that Defendants' alleged failures to send the policy could not have been made willfully based on their knowledge that he was on the registry, because he was not in fact on the registry when the events in this lawsuit occurred. And Graham did in fact receive the policy.

¶ 47.  Plaintiff has been on the do not call registry maintained by the FTC **since March 11, 2020**.

Complaint (emphasis supplied) (filed July 14, 2020), Dkt. No. 1 in *Graham v. National Web Design LLC,* District of Minnesota Case No. 20-cv-1575.

Then, 15 months later, on October 25, 2021 another TCPA complaint by Graham was removed by the defendants to this District (No. 21-cv-2367). There he stated that he registered number -9014 on the national do-not-call registry on May 5, 2021:

¶ 15.  Plaintiff placed his cell telephone number ending in 9014 on the Do Not Call Registry maintained by the Federal Trade Commission (FTC) **on May 5, 2021**.

¶ 16.  The May 4, 2021 email to Plaintiff from the Do Not Call Registry **confirming this registration** is attached here as Plaintiff's **Exhibit "A."**

¶ 17.  Telemarketers were **required to stop calling the Plaintiff 31 days after that registration date - June 5, 2021**.

Complaint (emphasis suppled) (signed Aug. 27, 2021; removed by the defendants Oct. 25, 2021) and Exhibit A (email from National Do Not Call Registry stating: "You successfully registered your phone number ending in 9014 on May 05, 2021."), Dkt. Nos. 1 and 1-1 in *Graham v. Charter Communications, LLC,* District of Minnesota Case No. 21-cv-2367.[13]

As to the second point, none of Graham's arguments in opposing summary judgment are premised on being on a do-not-call list (because he was not, during the relevant time). He does not allege he ever asked to be on IPL's do-not-call list. He specifically states he did not call the opt-out number. None of his letters to IPL (or

---

[13] While it may be possible to have two different cell phone numbers ending in -9014 that were added to the national registry on different dates, the record indicates that is not the situation here, as Graham listed the same phone number on the signature blocks of his complaints in the present case and in Nos. 20-cv-1575 and 21-cv-2367.

Intelemedia) include any request not to call him or any request to be placed on a do-not-call list. *See* Dkt. No. 77-1 at 1-9. He does not allege IPL's do-not-call policy is deficient in any way, or that IPL failed to follow its own policy. He does not allege IPL failed to follow any of the "procedures for maintaining a list of persons who request not to receive telemarketing calls" that are required under § 64.1200(d). All he alleges is that he did not receive a copy of IPL's do-not-call policy promptly enough or after his first request.

The situation here thus is distinguishable from the *Fischman* case cited by Graham. *See* Pl. Mem. ¶¶ 54, 72, 79, Dkt. No. 75. In *Fischman v. MediaStratX, LLC,* No. 2:20-cv-83-D, 2021 WL 3559639, at *4 (E.D.N.C. Aug. 10, 2021), the plaintiff alleged he registered his personal cell phone on the do-not-call registry, received telemarketing calls anyway, and told the telemarketing callers he did not want to receive any more calls, but kept receiving unwanted calls. The plaintiff argued those facts demonstrated that the defendant violated Rule 64.1200(d) by failing to institute procedures, such as written policies, personnel training, and maintenance of an internal do-not-call list, that meet the minimum standards of the rule. *Id.* at *6. The court found the plaintiff stated a plausible claim for a violation of Rule 64.1200(d) and denied the defendant's motion for judgment on the pleadings. *Id.* As Defendants here point out, *Fischman* did not involve a claim for failing to provide a copy of a do-not-call policy, or a claim for multiple statutory damages related to multiple requests for a policy that was in fact received. *Fischman* does not support Graham's claim in Count Two.

Accordingly, assuming a cause of action is otherwise available to Graham for a violation of § 64.1200(d)(1), the Court concludes his claim fails based on the facts here. Thus, the Court grants Defendants' motion for summary judgment on Count Two.

### (e)   Collateral Estoppel

In their reply memorandum Defendants asserted collateral estoppel as an additional basis for summary judgment, pointing to Graham's disclosure of the *Clearity* lawsuit in his opposition memorandum. As this argument was raised in the reply, Graham had no opportunity to brief it. Here, the Court has granted summary judgment on the ground that Graham gave prior express written consent by keypress to the robocalls. Thus, the Court need not address Defendants' additional argument based on collateral estoppel.

## II.   Motion for Sanctions

Following their summary judgment motion, Defendants brought a separate motion for sanctions against Graham under Federal Rules of Civil Procedure 11 and 26(g)(3), District of Minnesota Local Rules 1.3 and 7.1(g), 28 U.S.C. § 1927, and the Court's inherent authority. Dkt. No. 85. A hearing was held on November 9, 2021. Dkt. No. 92. They contend his sanctionable conduct includes bringing this frivolous lawsuit, abusing the *in forma pauperis* (IFP) rules, failing to follow several rules of civil procedure, and engaging in bad faith conduct during the lawsuit. *Id.* They ask the Court for reasonable attorney's fees and costs in defending the lawsuit and to restrict Graham from filing any civil lawsuit or claiming IFP status in the District of Minnesota without first obtaining leave of Court. *Id.* at 4-5.

To start, the Court notes that 28 U.S.C. § 1927 ("Counsel's liability for excessive costs") does not fit the facts here. Section 1927 provides:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to

satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

Graham brought this lawsuit as a *pro se* plaintiff. Although he signed his Complaint as "Plaintiff and Attorney *pro se*," *see* Dkt. No. 1 at 15, he is not an attorney. He used to be an attorney but was disbarred in 2000 for a variety of misconduct. *See In re Disciplinary Action Against Chester C. Graham*, 609 N.W.2d 804 (Minn. 2000). After he was disbarred he was convicted of mail fraud in this District. *See United States v. Graham,* No. 00-cr-275 (D. Minn. 2001). The record indicates he is not an "attorney or other person admitted to conduct cases" in any federal court as required by the statute.[14]

Moreover, § 1927 applies to conduct that vexatiously multiplies the proceedings in a case. Simply commencing a frivolous lawsuit is not sanctionable under § 1927. *See Gurman v. Metro Housing & Redev. Auth.,* 884 F.Supp.2d 895, 900-901 (D. Minn. 2012). The only proceedings in this lawsuit were Defendants' motion to compel phone records, motion for summary judgment, and motion for sanctions. Graham's sanctionable conduct here did not involve vexatious multiplication of the proceedings. *Cf. id.* at 899 (plaintiffs' counsel brought "three kitchen-sink complaints . . . assert[ing] literally *hundreds* of claims against defendants, almost all of which were frivolous," even after counsel "had been clearly and emphatically warned by this Court to refrain from" doing so). His pattern is

---

[14] The Eighth Circuit has not addressed whether § 1927 applies to a *pro se* non-lawyer litigant. The Court agrees with the Second Circuit that a non-lawyer is not a "person admitted to conduct cases" under the statute. *Sassower v. Field*, 973 F.2d 75, 80 (2d Cir. 1992) ("the word 'admitted' in this context suggests application to those who, like attorneys, gain approval to appear in a lawyerlike capacity," whereas "parties generally have a right to appear *pro se*"). The Ninth Circuit follows a different rule. *Wages v. I.R.S.,* 915 F.2d 1230, 1235-36 (9th Cir. 1990).

actually the opposite. In this case and in other TCPA lawsuits he has brought, his pattern is to do as little as possible after filing a complaint and seeking a settlement.

Rather, the Court finds Graham's conduct is sanctionable under Rule 11(b) of the Federal Rules of Civil Procedure. Rule 11(b) provides:

> (b) **Representations to the Court.** By presenting to the court a pleading, written motion, or other paper — whether by signing, filing, submitting, or later advocating it — an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:
>
> > (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
> >
> > (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
> >
> > (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
> >
> > (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

If the Court determines that Rule 11(b) has been violated, it may impose an appropriate sanction on a party that violated the rule. Fed. R. Civ. P. 11(c)(1). Such sanction "must be limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." *Id.* 11(c)(4). It may include non-monetary directives, an order to pay a penalty into the court or, if warranted for effective deterrence, an order to pay reasonable attorney's fees or expenses directly resulting from the violation. *Id.* The primary purpose of Rule 11 sanctions is to deter attorney and litigant misconduct, not to

24

compensate the opposing party for all of its costs in defending a lawsuit. *Vallejo v. Amgen, Inc.*, 903 F.3d 733, 747 (8th Cir. 2018). The Court considers which sanction will adequately deter the undesirable conduct. *Id.* The Court also considers the party's ability to pay any monetary sanction. *See, e.g., In re Yehud-Monosson USA, Inc.,* 472 B.R. 868, 880 (D. Minn. 2012) ("Although one factor a court imposing sanctions should consider is the sanctioned party's ability to pay, there is no abuse of discretion in failing to consider this factor when it was not raised before the sanctioning court."); *Willhite v. Collins,* 459 F.3d 866, 870 (8th Cir. 2006) (sanctioned party has obligation to raise inability to pay); *Landscape Props., Inc. v. Whisenhunt*, 127 F.3d 678, 685 (8th Cir. 1997) (sanctioned party did not raise inability to pay, and nothing in the record suggested inability to pay the amount).

Graham engaged in sanctionable conduct under Rule 11(b). He lacked candor to Defendants and the Court. As described in Part I of this Order, he made false, misleading, and conflicting statements about the information that appears in the key documents in this case, *i.e.,* his Sprint phone records and the IPL records regarding his -9014 cell phone number. He did so even after the Sprint records were obtained (pursuant to Defendants' motion to compel) and after Defendants submitted and relied on those records in support of their summary judgment motion. He intermingled his misstatements of the evidence with mischaracterizations of Defendants' arguments. Even if the Court accepts that, when he filed his Complaint on July 6, 2020, (1) he may have believed in good faith that he did not give prior consent to the August 9, 13, and 14, 2019 robocalls or (2) he did not have a record of making the August 1, 2019 call (because he did not have his Sprint phone records in hand), once his Sprint phone records were obtained, he had no evidentiary

support for his assertion that the August 1 call was an inbound call to him from IPL, or that it was an outbound call by him but that the number he called was the U.S. District Court for the District of Minnesota.

In addition, Graham's Complaint falsely suggests he was on the national do-not-call registry during the times relevant to this lawsuit. *See* Compl. ¶ 43, Dkt. No. 1. In two other lawsuits in this District he made conflicting statements about when he registered his -9014 number: one of his complaints said March 11, 2020 (No. 20-cv-1575) and another said May 5, 2021 (No. 21-cv-2367). If the correct date is March 11, 2020, he had that information but did not disclose it in his Complaint which he filed on July 6, 2020 (or in his memoranda opposing summary judgment and sanctions). If the correct date is May 5, 2021 (the date stated in the confirmation email from the National Do Not Call Registry that Graham attached to his complaint in No. 21-cv-2367), then he knew he was not on the registry either at the time of the events in this case or at the time he filed this lawsuit.

Graham also was not candid with the Court in his IFP application because he did not disclose money he received from TCPA settlements during the 12-month period prior to the application. *See* Dkt. No. 2. Section 1 of the application requires disclosure of income: "money received from each of the following sources during the past 12 months," listing specific categories such as employment, interest and dividends, gifts, alimony, retirement, etc., and including an "other" category for money received that does not fall into any other category. *Id.* Graham's TCPA settlements are income to him. *See, e.g., Arkow v. Commissioner of Internal Revenue,* No. 880-15S, T.C. Summ. Op. 2016-87, 2016 WL 7377286, at *3 (U.S. Tax Court Dec. 20, 2016) (settlement of TCPA claim is taxable income). Moreover, the IFP application does not require identification of the

payor, so settlement amounts can be listed without violating any confidentiality provision that may exist in a settlement agreement.

The Court has inherent power to manage its own affairs, to supervise and discipline persons who appear before it, and to "fashion an appropriate sanction for conduct which abuses the judicial process." *Vallejo*, 903 F.3d at 749. During the course of this lawsuit, it came to the Court's attention that Graham has been a *pro se* plaintiff in 16 TCPA lawsuits in this District, including this one and the *Clarity* case identified in footnote 7 of this Order. *See* District of Minnesota cases No. 13-cv-138; No. 18-cv-726, No.18-cv-727, No. 18-cv-728, No. 18-cv-729, No. 18-cv-730, No. 18-cv-933, No. 18-cv-1023, No. 19-cv-1771, No. 19-cv-2779, No. 20-cv-1301, No. 20-cv-1525, No. 20-cv-1575, No. 20-cv-1791, No. 20-cv-2116, and No. 21-cv-2367. As the *Clearity* case settled shortly before this lawsuit was filed, the Court reviewed Graham's IFP application and saw it did not disclose the money he received in the *Clearity* settlement. The Court then ordered Graham to provide, confidentially to the Court, information about amounts received in his three most recent settlements. *See* Order (Nov. 15, 2021), Dkt. No. 93. The information he provided showed he received money during the relevant period that he did not disclose on his IFP application. A review of his IFP applications in other TCPA lawsuits shows he has not disclosed any settlement amounts he received.

The Court cannot say that this lawsuit was frivolous at the time it was filed and that Graham knew it to be so. The Court also cannot conclude from the record that his other TCPA lawsuits were frivolous. When cases settle, are dismissed for lack of prosecution, or are dismissed pursuant to stipulation, it is not possible to say for sure that any particular case lacked merit. Similarly, mere volume of cases does not amount to abuse of the court

27

system. The Court is not and would not sanction Graham based on the number of TCPA cases he has brought.

However, the Court sanctions him for his lack of candor in the present lawsuit and for abusing the judicial and IFP process by his lack of candor in applying for IFP status. Although the settlement amounts he disclosed to the Court were relatively modest, they should have been included on his IFP application. The Court declines to impose a monetary sanction because the present record indicates that Graham has little ability to pay either a fine to the Court or attorney's fees and costs to Defendants.[15] The Court finds a non-monetary sanction is appropriate to deter future violations. Specifically, the Court enjoins Graham from filing any other action in the District of Minnesota unless it is accompanied by the appropriate filing fee or unless he has first obtained written permission from a judicial officer in this District to file an IFP application. If Graham seeks permission to apply for IFP status, he must disclose settlement amounts he has received during the relevant time period and must attach a copy of this Order to his request for permission and to his prospective IFP application. Failure to do so may subject him to further sanctions, including contempt. Graham is further reminded that an IFP application is made under penalty of perjury, and any false statements may result in dismissal of claims, imprisonment, or a fine. *See* 18 U.S.C. §§ 1621, 3571. *See, e.g., Tuck v. Capitol One Bank,* No. 3:17-cv-01555, 2017 WL 6547739, at *3 (S.D. Cal. Dec. 20, 2017) (denying IFP application in TCPA case and imposing condition on any future IFP applications, noting "discrepancies between Tuck's two [original and amended] IFP

---

[15] Graham did not specifically argue inability to pay in his opposition memorandum. *See* Dkt. No. 82.

28

applications [and] the number of other cases filed and later 'settled' or 'dismissed' in this Court").

The Court has particular concern about abuse of the IFP process and the associated burdens and costs that are shifted to the Court and related personnel. *See, e.g., Hurt v. Soc. Sec. Admin.,* 544 F.3d 308, 310 (D.C. Cir. 2008) (revoking plaintiff's IFP privilege and stating "[e]very paper filed with the Clerk of this Court . . . requires some portion of the institution's limited resources. A part of the Court's responsibility is to see that these resources are allocated in a way that promotes the interests of justice," quoting *In re McDonald,* 489 U.S. 180, 184 (1989) (per curiam)). All of his 16 TCPA cases are either IFP or were removed by the defendants to federal court, and thus Graham pays no federal court filing fees.[16] Service of process is handled by the U.S. Marshals Service and/or the Office of the Clerk of Court. *See, e.g.,* Order, Dkt. No. 13. In many of his cases, after Graham files his *pro se* complaint and is granted IFP status, there is little or no activity shown on the docket until he files a stipulation to dismiss the case. Often this happens before the defendant is served or has appeared, although sometimes it happens after service and response by the defendant.

The pattern of his TCPA cases reasonably suggests that Graham uses the IFP process as an instrumentality to induce quick settlement, at no cost to himself,[17] and that

---

[16] Four cases were removed to federal court and 12 cases are IFP status.

[17] In addition to paying no federal court filing fees due to his IFP status, it appears he also may not pay the costs related to the telephone number -9014 that is the basis of his lawsuits, as he states it is a Lifeline cell phone. The Federal Lifeline Assistance Program is a federally funded government program that provides free or discounted cell phone service to low-income individuals. https://qlinkwireless.com/lifeline/about-lifeline (last accessed March 3, 2022).

29

if prompt settlement is not forthcoming, he abandons or all-but-abandons the case if it requires anything more than minimal effort on his part. *See, e.g.,* No. 18-cv-933 (dismissal for failure to prosecute under Rule 41(b)); No. 21-cv-2116 (dismissal for failure to prosecute under Rule 41(b)); No. 20-cv-1791 (defendant's motion to dismiss granted; Graham did not file a response or appear at the hearing). In a recent case, No. 20-cv-1575, a defendant did not appear despite efforts by the U.S. Marshals Service to serve the complaint. Graham then requested a default judgment. However, he did not follow the correct process and did not file a memorandum to support a default award of the treble damage amount sought in his lawsuit. As a result, the Court in that case issued a 15-page order on January 21, 2022 extensively analyzing the service of process issues as well as the allegations in his Complaint. *See* Order, Dkt. No. 19 in No. 20-cv-1575. The Court dismissed without prejudice Graham's motion for a default judgment, reminding him that if he seeks to re-file a renewed motion, it is his "responsibility, not the Court's, to present an argument in favor of entry of default judgment." *Id.* at 5, 15. It remains to be seen whether he will re-appear in the case.

Accordingly, for all of the above reasons, the Court finds it an appropriate sanction to restrict Graham's ability to proceed IFP in future lawsuits in this District without prior Court oversight and permission.

## ORDER

For the reasons set forth above, the Court enters the following ORDER:

1.      Defendants Intelemedia Communications, Inc. and Intelemedia Premier Leads, LLC's  Motion for Summary Judgment [Dkt. No. 66] is **GRANTED** and this action is dismissed with prejudice.

30

2. Defendants' Motion for Sanctions [Dkt. No. 85] is **GRANTED IN PART AND DENIED IN PART**.

a. The Court denies the request for attorney's fees and costs as a sanction because the record indicates Graham lacks the ability to pay.

b. The Court enjoins Graham from filing any other action in the District of Minnesota unless it is accompanied by the appropriate filing fee or unless he has first obtained written permission from a judicial officer in this District to file an IFP application. If Graham seeks permission to apply for IFP status, he must disclose settlement amounts he has received during the relevant time period and must attach a copy of this Order to his request for permission and to his prospective IFP application. Failure to do so may subject him to further sanctions, including contempt. Graham is further reminded that an IFP application is made under penalty of perjury, and any false statements may result in dismissal of claims, imprisonment, or a fine. *See* 18 U.S.C. §§ 1621, 3571.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 10, 2022                             _____s/David T. Schultz_____
                                                                      DAVID T. SCHULTZ
                                                                      U.S. Magistrate Judge